Filed 8/28/24  Gosselin v. Superior Court CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| MARGARET GOSSELIN, | C100081 |
| Petitioner, | (Super. Ct. No. 23UCM10) |
| v. | |
| THE SUPERIOR COURT OF MONO COUNTY, | |
| Respondent; | |
| LEVY PREMIUM FOODSERVICE LIMITED PARTNERSHIP et al., | |
| Real Parties in Interest. | |

In November 2020, Margaret Gosselin electronically signed multiple documents in connection with her application to be a bartender at a restaurant near a ski resort.  Among the documents signed was an agreement to arbitrate all disputes related in any way to her employment with Compass Group USA, Inc. (Compass Group), the parent company of Levy Premium Foodservice Limited Partnership (Levy), which owned or operated about 20 food and beverage operations in the ski resort area, including the restaurant where

1

Gosselin applied to work. Gosselin ultimately declined the bartending position in a text message to the manager of the restaurant. One month later in January 2021, the manager of a different restaurant in the same ski resort area texted her about an opening as a cashier. Levy operated that restaurant as well. On her first day of work at the second restaurant, Gosselin signed paperwork specific to the restaurant, which was different from the initial "onboarding" documents she signed in November 2020.

In February 2023, Gosselin filed a lawsuit against Levy, her manager at the second restaurant, and others, asserting multiple causes of action, including sexual harassment and failure to prevent sexual harassment. Levy moved to compel arbitration pursuant to the arbitration agreement Gosselin signed in November 2020, arguing it hired Gosselin as an employee for the winter snow season that typically starts in November and ends in May of the following year. The trial court granted Levy's motion, and Gosselin filed the instant petition for writ of mandate challenging that ruling.

Gosselin's arguments in this court are forfeited because she could have raised them in her trial court papers but did not. It would be unfair to the trial court and contrary to principles of judicial economy to consider them now. Accordingly, we deny the petition for writ of mandate.

BACKGROUND

In the fall of 2020, Gosselin applied for a position at 53 Kitchen and Cocktails (53 Kitchen), a restaurant in the Mammoth Mountain ski resort area of Mammoth Lakes, California. Among the documents that Gosselin electronically signed in connection with that application was a one-page arbitration agreement (the agreement), which provided in relevant part: (1) that it "outlines the arbitration program maintained by Compass Group USA, Inc. and its companies, subsidiaries, sectors, affiliates and divisions ('Compass Related Entities')"; (2) that it "covers any claim that arises out of or relates to the undersigned's employment with any of the Compass Related Entities"; and (3) that "I and the Compass Related Entities agree to utilize binding individual arbitration as the sole

2

and exclusive means to resolve all disputes that may arise out of or be related in any way to my employment, including but not limited to the termination of my employment and my compensation." Gosselin was unaware that 53 Kitchen, like approximately 20 other local food and beverage operations, was owned or operated by Levy, a wholly owned subsidiary of Compass Group.

According to Levy, Gosselin was hired for a bartending position at 53 Kitchen on November 18, 2020, when she accepted the position and signed onboarding documents; but she did not start that assignment. In Gosselin's telling, she (1) sent a text message to 53 Kitchen's manager declining the bartending job on November 21, 2020, (2) left California in mid-December 2020, considering herself unemployed, and (3) returned to Mammoth Mountain in late January 2021, when she learned of a job opening at The Outpost through her roommate, who gave Gosselin's phone number to the restaurant's manager. The Outpost manager texted Gosselin about the open position, which Gosselin chose to accept. Gosselin had to sign additional location-specific policies and in-person documents before starting at The Outpost and on her first day of work on February 1, 2021, she was told to sign documents during a two-minute encounter.[1]

Gosselin alleges that in her first week working as a cashier at The Outpost her manager made sexually charged comments about her appearance, and in her second week there the manager touched her inappropriately multiple times, including frequently sliding past her in the narrow space behind the bar while she was working the cash register and rubbing his crotch against her buttocks.

Gosselin further alleges that one day in late February 2021, the manager appeared to be intoxicated or under the influence of drugs when he told Gosselin he wanted to kiss

---

[1] Gosselin asserts, with inadequate citations to the record, that some of the training she received in 2021 was duplicative of training she underwent "as part of her new hire onboarding process on November 18, 2020."

her.  The next morning, the manager drove Gosselin to work on a snowmobile, promising to " 'drive like a fucking speed demon.' "  When the manager later lost control of the snowmobile, Gosselin struck the icy part of the trail, causing a concussion and snow burns to her torso.  Due to those injuries, Gosselin went on workers' compensation leave, where she remained until she resigned from The Outpost in October 2021.

In February 2023, Gosselin filed a civil complaint against her manager at The Outpost, Levy, the Mammoth Mountain Ski Area, LLC, and others, asserting nine causes of action, including sexual battery, sexual harassment, and failure to prevent sexual harassment.  In the complaint, Gosselin asserted that before she filed the civil action, she filed a complaint with a state agency tasked with investigating allegations of employment law violations and the agency gave her a " 'right to sue' " letter.

In June 2023, Levy filed a motion to compel arbitration of Gosselin's civil action, invoking the agreement.  Gosselin opposed, arguing (1) she never signed an arbitration agreement for her job at The Outpost; the arbitration agreement she signed in November 2020 was related to a job at 53 Kitchen that she "declined and did not work"; and any prior employment relationship between Gosselin and Levy "had terminated" by the time she started working at The Outpost, and (2) certain non-Levy defendants were not third party beneficiaries of the agreement.

The trial court requested supplemental briefing from the parties on the nature of the employment relationship between Gosselin and Levy, whether Gosselin had a single or multiple terms of employment with Levy, and to what extent the agreement covered Gosselin's claims.  In that supplemental briefing, Levy explained that for the winter snow season that typically starts in November and ends around May, it routinely hires hundreds of employees for around 20 food and beverage operations throughout Mammoth Mountain, and hired Gosselin "as a seasonal employee in November 2020 to work during the 2020-2021 winter season."  Levy maintained that Gosselin's seasonal employment

4

relationship with Levy continued after she declined the bartending job at 53 Kitchen because neither party ever terminated the relationship.

A supporting declaration by Levy's director of human resources indicated that (1) a gap between a hire date and a start date is not unusual for Levy because the company recruits and hires hundreds of people before the start of the winter snow season; (2) new hires may be assigned to work a single event, may transfer from one location to another, and may start and stop working at various locations throughout the season; (3) absent resignation or termination by Levy for violation of company policy or improper conduct, everyone hired at the beginning of the winter season remains employed until the season ends, when the manager of each location decides how many employees are needed to operate the business through the summer season; and (4) because Levy never terminated Gosselin's employment, Gosselin never told Levy she resigned, and 53 Kitchen's manager never indicated to Levy that Gosselin had resigned, Levy's internal human resources system categorized Gosselin as continuously employed from November 18, 2020, to February 1, 2021, when she started working at The Outpost.

In her supplemental briefing for the trial court, Gosselin argued (1) she was never employed by Levy before she worked at The Outpost because "it would have violated federal law," and (2) even if she was employed at 53 Kitchen, "she quit" when she sent a text message declining the job and "no one can be forced into employment against their will." (Capitalization omitted.) In a supporting declaration, Gosselin asserted (1) 53 Kitchen is open all year, (2) her application to work there was specific to 53 Kitchen and she would not have applied for or accepted a position as a "roaming employee" for Levy, and (3) when she exchanged text messages with the manager of The Outpost in January 2021, she did not believe there was any connection between the opening at The Outpost and her November 2020 application to work at 53 Kitchen.

At the beginning of an October 2023 hearing, the trial court indicated it was inclined to grant Levy's motion to compel arbitration, explaining: "The agreement

covered any claims that arise out of or relate to [Gosselin's] employment with *any* of the Compass Related Entities.  [¶]  And that's a very broad scope . . . .  It does not mention Kitchen 53.  The agreement is to engage in employment with Compass Group.  Ms. Gosselin agreed to employment with Compass Group -- and I return to the contract -- would be to -- would be to be bound by this arbitration agreement.  I think the court finds that's a reasonable interpretation."  (Capitalization omitted & italics added.)

Regarding the nature of Gosselin's employment with Levy, the trial court explained it was clear from the supplemental declarations that "Levy hires people, *including Ms. Gosselin*, *for the season* . . . .  The court does appreciate Kitchen 53 may be open year []round and Ms. Gosselin's declaration . . . may have made some possible argument that she did not know she was working as a seasonal employee."  But it was "clear she was never discharged" and she "agreed to be bound by an arbitration agreement with *any* employment related to Compass Group."  (Capitalization omitted & italics added.)

Invoking the principle that arbitration should be upheld unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation that covers a dispute at issue, and again noting the agreement's "broad . . . scope," the trial court reiterated its inclination to grant Levy's motion, and then gave the parties an opportunity to make oral argument.

At one point, counsel for Gosselin wondered aloud:  "How's a person supposed to know that" 53 Kitchen, "this one restaurant in the town of Mammoth is also somehow connected to this small ski resort?"  The trial court replied:  "These are always interesting questions when an employee shows up and doesn't even pay attention much -- I get the job, great.  Here, sign this.  Okay, great.  And she signs it. . . .  [¶]  People do what they do.  The law is what it is.  A contract is what it is. . . .  [Gosselin] signed this agreement.  If she asked a simple question, who's Compass Group?  Oh, Compass Group is Levy.

6

Who's Levy? Levy . . . has all the food service in the mountain. Oh, okay."
(Capitalization omitted.)

At another point, the trial court emphasized that because Gosselin was a seasonal employee her decision not to take the bartending job at 53 Kitchen was not dispositive: "She didn't formally resign. She said, I don't want to work here. And the employer understood. Fine. . . . Hundreds and hundreds of employees come in every winter. Some work out for the whole winter, some work out for [a] short . . . period of time. At the end of the season, they're all terminated. . . . [¶] And Ms. Gosselin is just one of those people. She didn't have to go through . . . all" the original onboarding paperwork when she went to work at The Outpost because, "from the global perspective for that season, she . . . had entered into this arbitration agreement with the Compass Group." (Capitalization omitted.)

In its colloquy with the parties during oral argument, the trial court returned multiple times to the clause in the agreement that said it covered claims arising out of or related to Gosselin's employment with "any of the Compass Related Entities." (Capitalization omitted.)

After the trial court granted Levy's motion to compel Gosselin challenged that ruling in a petition for writ of mandate filed with this court in December 2023, asking us to direct the trial court to vacate its order and to enter a new order denying the motion.[2] After we ordered Levy to show cause why Gosselin was not entitled to the relief she requested, Levy filed a pleading in February 2024, and Gosselin filed her reply two

---

[2] "While an order denying a petition to compel arbitration is immediately appealable by statute, an order compelling arbitration is not. . . . [W]e grant writ review of orders compelling arbitration only in ' "unusual circumstances" ' or in ' "exceptional situations." ' " (*Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1050.)

7

weeks later.  The parties appeared before this court for oral argument on August 21, 2024.

DISCUSSION

I

*Background Legal Principles*

A.          *Standard of Review, Presumptions on Appeal, and Extrinsic Evidence*

"As with any appeal, we presume the trial court's order granting [a] petition to compel arbitration is correct, and it is the responsibility of [the litigant seeking mandamus relief] to show reversible error."  (*Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 991.)  "[U]nder both state and federal law, there is a strong policy favoring arbitration."  (*Ramos v. Superior Court*, *supra*, 28 Cal.App.5th at p. 1051.)  Given this heavy presumption in favor of arbitrability, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, unless the arbitration clause is not susceptible to an interpretation that covers the asserted dispute.  (*Ibid.*)

Contracts are interpreted "to give effect to the mutual intention of the parties at the time of contracting, to the extent ascertainable and lawful.  [Citations.]  The mutual intent of the parties is ascertained from the contract language, which controls if clear and explicit.  [Citations.]  Where necessary, a contract may be interpreted by reference to the circumstances under which it was made or the matter to which it relates.  [Citations.] . . . Extrinsic or parol evidence may be used to explain ambiguity, context or related matter."  (*Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd*. (2010) 189 Cal.App.4th 101, 110-111.)

A trial court's threshold determination of ambiguity is subject to independent review, and if there is conflicting extrinsic evidence that requires credibility determinations, the trial court's reasonable construction will be upheld as long as it is supported by substantial evidence.  But when extrinsic evidence is *not* in conflict, a reviewing court should construe a contract independently as a question of law.  (*Winet v.*

8

*Price* (1992) 4 Cal.App.4th 1159, 1165-1166.) And if the extrinsic evidence itself is not in conflict, but the parties draw conflicting *inferences* from it, a reviewing court should independently draw its own inferences (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268, fn. 4), keeping in mind that " 'all conflicts' " should be resolved by drawing " 'every reasonable inference to support the trial court's ruling' " (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 250).

B.    *Forfeiture*

" 'All issues, even those involving an alleged constitutional violation, are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it.' " (*In re M.H.* (2016) 1 Cal.App.5th 699, 713.) "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider." (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)

II

*Gosselin's Arguments are Forfeited Otherwise Unpersuasive*

None of the arguments that Gosselin raises in her briefing in this court were raised in her written filings in the trial court. Here, we discern five discrete arguments that Gosselin raises in this court: (1) the agreement was not valid because there was no adequate consideration;[3] (2) the agreement did not cover claims arising from Gosselin's

---

[3] Gosselin raised this issue for the first time in oral argument in the trial court. But that is not sufficient to preserve the issue for review. (Cf. *Rancho Pauma Mutual Water Co. v. Yuima Municipal Water Dist.* (2015) 239 Cal.App.4th 109, 118-119 ["Alluding to an issue . . . during oral argument" in the trial court "in a case involving numerous documents is insufficient to preserve the issue" for appeal]; *Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 172, fn. 17 [litigants "preserved [an] issue for appellate review, if only barely," where — in addition to a comment on that issue

9

future employment with Levy, because (a) under an objective standard, a "reasonable person would assume" that any paperwork submitted in connection with an application for a specific job would have no effect beyond that job absent some explicit warning or language or agreement to the contrary, (b) Gosselin acted "consistent with her belief" that she was not employed by Levy at any time prior to February 1, 2021, and (c) nothing in the agreement purported to define who the "Compass Related Entities" were; (3) the terms "my employment" and "employment" in the agreement are ambiguous, triggering application of the principle that courts should construe ambiguous terms against the drafter of a contract; (4) a case that Levy relied on in its supplemental briefing in the trial court is inapposite;[4] and (5) the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (9 U.S.C. §§ 401, 402), which became effective on March 3, 2022, indicates Congress no longer favors arbitration in disputes concerning sexual assault and sexual harassment, so we should not "automatically defer to cases that discuss Congress's outdated" preference for arbitration of those disputes.

We decline to consider these arguments that Gosselin could have raised in her written filings below, as it would be unfair to the trial court and contrary to principles of judicial economy to do so. (See *In re M.H.*, *supra*, 1 Cal.App.5th at pp. 713-714 ["Considering an issue for the first time on appeal is often unfair to the trial court, unjust

---

during oral argument in the trial court — they argued the issue in a request for judicial notice made in connection with a responsive pleading].)

[4] To the extent this argument is not forfeited on appeal, it is unpersuasive. We review the correctness of the order granting or denying a petition to compel arbitration, not the trial court's reasoning. (*Hoover v. American Income Life Ins. Co*. (2012) 206 Cal.App.4th 1193, 1201.) Here, regardless of whether a case the trial court relied on is on all fours with the instant dispute, the key consideration is that the agreement covered any claim that related to Gosselin's employment with any Compass Group subsidiary, of which Levy was one.

to the opposing party, and contrary to judicial economy because it encourages the embedding of reversible error through silence in the trial court"].)**5**

DISPOSITION

The petition for writ of mandate is denied.  Levy shall recover its costs on appeal. (Cal. Rules of Court, rule 8.493(a)(1)(A).)

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
RENNER, Acting P. J.

_____/s/_____
MESIWALA, J.

---

**5** The parties had the opportunity to brief forfeiture, a rule always implicated when a party raises an argument for the first time in the reviewing court.  (See *People v. Alice* (2007) 41 Cal.4th 668, 679 ["The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of [Government Code] section 68081."].)